# Mary Yingst *v.* Lebanon & Annville St. Ry. Co., Appellant.

*Negligence—Street railways—Speed of car—Fright of horse.*

The right of a street railway company to run its cars over its tracks, laid upon a public highway, is equal to the right of travelers to the use of the highway. They have a right to go "fast," and the mere fact that a traveler's horse takes fright at an approaching car confers no right of action whatever upon the traveler against the street railway company for an injury resulting from the fright of the horse.

Plaintiff was injured while driving a wagon along a street on which defendant, a street railway company, operated an electric railway. The horse took fright at an approaching car, and, turning suddenly, the wheel struck some obstacle, overthrowing it and causing the injury. Plaintiff alleged that the car was run at an unlawful rate of speed. Her testimony was that the car "came at full headway;" that "they were running pretty fast;" "they came swiftly past us." Other witnesses for plaintiff testified that the horse did not begin to shy until the car was within twenty or thirty feet from him. There was no evidence of the actual speed of the car, or that it was greater than was allowable; nor as to what would be a reasonably prudent rate of speed. *Held,* that the testimony was insufficient to establish negligence on the part of the defendant, and a nonsuit should have been entered.

In order to create liability against the defendant in such case, the evidence should clearly show that the car was moving at an unusual rate of speed, or at a rate which was not reasonably prudent, or at such definite rate in miles per hour as would of itself show that it was excessive, or at a rate greater than is allowed by the municipal ordinances; and as the plaintiff in this case was not a passenger, the burden of proof was on her to establish the truth of her allegations by affirmative testimony, failing in which she must fail in her suit.

Argued Feb. 21, 1895. Appeal, No. 293, Jan. T., 1895, by defendant, from judgment of C. P. Lebanon Co., Sept. T., 1893, No. 10, on verdict for plaintiff. Before GREEN, WILLIAMS, McCOLLUM, DEAN and FELL, JJ. Reversed.

Trespass to recover damages for personal injuries. Before MEILY, P. J.

At the trial it appeared that on July 29, 1892, plaintiff was injured by the overturning of a wagon on a street on which defendant company operated a line of electric railway. The substance of plaintiff's testimony was that the horse drawing

the wagon became frightened while one of defendant's cars was some distance away and continued to shy as it approached nearer, that then the driver signaled the motorman with outstretched hand and with shoutings to stop the car; that no attention was paid to these signals; that the car came on at "full headway" and "passed swiftly by," and that when opposite the car the horse backed and turned around suddenly, overturning the wagon, whereby the injuries were caused to her.

Ernest Witters, a witness for plaintiff, testified that as the car approached the driver shouted several times at the top of his voice to the motorman to stop, that he could not manage the horse; that the motorman did not heed these warnings but ran the car about a half square beyond the point of the accident before he stopped.

John Doody testified that the horse reared up while the car was still twenty or thirty feet away and that he could not say what the speed of the car was at the time. Other portions of the testimony are quoted in the opinion of the Supreme Court.

Defendant's points were, among others, as follows:

"2. The negligence charged in this case, by the plaintiff, being the excessive and improper rate of speed at which the car was run, and there being no proof that the car was so run, it is error to submit the question to the jury, and the jury should be instructed to find for the defendant. *Answer:* This point is reserved." [1]

"4. Street car companies, having as much right to run their cars on the streets of the city as other citizens to drive through them with their horses and carriages, are not responsible for horses taking fright at the movement of their cars. *Answer:* Affirmed, provided the defendant's cars are run in the proper and usual manner." [2]

"5. Under all the evidence in this case the verdict of the jury must be for the defendant. *Answer:* Refused." [3]

Verdict and judgment for plaintiff for $1,000. Defendant appealed.

*Errors assigned* were (1–3) above instructions, quoting them.

*Grant Weidman,* for appellant.—The burden of proof was on plaintiff to show negligence: R. R. v. Hummell, 44 Pa. 379; Booth on St. Ry., sec. 298; Hazel v. Pass. Ry., 132 Pa. 101; Piollet v. Simmers, 106 Pa. 95; Pittsburg St. Ry. v. Taylor, 104 Pa. 306; Steiner v. Traction Co., 134 Pa. 199; Ehrisman v. Pass. Ry., 150 Pa. 180; P. & R. R. Co. v. Heil, 5 W. N. C. 91.

A railroad company is not liable for damages resulting from the ordinary legitimate and lawful use of its road: Drayton v. R. R., 10 W. N. C. 55; Steiner v. Traction Co., 134 Pa. 202.

Street car companies are not responsible for horses taking fright at the movement of their cars: Chapman v. Zanesville St. Ry., 27 Ohio L. J. 90; Fox v. Borkey, 126 Pa. 169.

There was no evidence to justify an inference of negligence and the case should have been taken from the jury and a verdict directed for the defendant, as was requested: Traction Co. v. Bernheimer, 125 Pa. 615; Fouhy v. Pa. R. R., 17 W. N. C. 177; Burrell v. Gowen, 134 Pa. 527; Phila. & R. R. R. v. Yerger, 73 Pa. 121; Jennings v. R. R., 93 Pa. 340; Goshorn v. Smith, 92 Pa. 435.

Under the authority of Fischer v. The Ferry Co., 124 Pa. 154; Traction Co. v. Bernheimer, 125 Pa. 619; Thomas v. Pass. Ry., 132 Pa. 513, this testimony was insufficient to submit to the jury in order to find the facts.

The negligence of the railway company, if any, was not the proximate but the remote cause of the accident, and therefore there could be no recovery: West Mahanoy v. Watson, 112 Pa. 574; South Side Ry. v. Trich, 117 Pa. 390.

*Thomas H. Capp, J. M. Funck* and *George B. Schock* with him, for appellee.—The defendant was negligent in running the car at a great speed: Dunseath v. Traction Co., 161 Pa. 129; Schnur v. Citizen Traction Co., 153 Pa. 29; Ehrisman v. Harrisburg Ry. Co., 150 Pa. 186; Gilmore v. Pass. Ry., 153 Pa. 31; Gibbons v. Wilkes-Barre St. Ry., 155 Pa. 279; Kestner v. Traction Co., 158 Pa. 422.

The question of proximate cause where the facts are disputed is for the jury: Twp. of West Mahanoy v. Watson, 112 Pa. 574; Bunting v. Hogsett, 139 Pa. 373.

OPINION BY MR. JUSTICE GREEN, April 15, 1895:

The plaintiff's injury resulted from the upsetting of a wagon in which she was riding, occasioned exclusively by the fright of the horse drawing the wagon. The horse took fright upon seeing an approaching street car on the defendant's track, and, turning suddenly away from the road, the wheel of the wagon struck a stone or other obstacle, and this caused the overthrow of the vehicle. There was no collision of any kind, the wagon was not on the track but was being drawn upon the highway on which the defendant's track was laid.

The only ground upon which the claim of the plaintiff for damages was asserted in the statement of cause of action, and alleged on the trial, was negligence in running the car at too great speed and in not regarding signals given by the driver of the wagon. As the right of the defendant company to run its cars on its tracks is fully equal to the right of the plaintiff to ride in a wagon on the street, the mere fact that the horse took fright at the sight of the car confers no right of action whatever against the defendant: Hazel v. Passenger Railway Co., 132 Pa. 96; Piolett v. Simmers, 106 Pa. 95; Pittsburg St. R'y Co. v. Taylor, 104 Pa. 306. It is only for an abuse of the right to the injury of another that the company is responsible. In this case it is alleged that the car was running at an excessive rate of speed, and that this was such an abuse of the right of passage as to amount to culpable negligence which caused the fright of the horse and thereby occasioned the injury to the plaintiff. The case therefore centres upon this proposition of fact. Does the evidence sustain this charge? To make out such an allegation it is necessary to know what is the standard of legitimate speed for an electric car on such a street, and, next, was that standard exceeded in this case. The plaintiff, not being a passenger, is subject to the burden of proof, and must establish the truth of her allegations by affirmative testimony, failing in which, she fails in her suit.

Upon this subject, having read every particle of the testimony with patient attention, we are bound to say that the plaintiff has furnished no proof whatever, either as to what is the lawful rate of speed at which an electric car may run over such a street or any street, or as to whether the rate at which this car ran at the time of the accident was in excess of lawful

speed. Her whole testimony as to the fact of the accident consisted of the evidence given by herself and two other witnesses, Witters and Doody. Not one of them was even asked the question whether the speed of the car was greater than was allowable for an electric car to run, or whether they had any knowledge upon that subject. No experts in such matters were called to testify as to what would be a reasonably prudent rate of speed for such a car over such a street, and in short no evidence whatever was given upon that subject. Nor was any evidence given for the plaintiff as to the actual rate of speed at which this car was run, and therefore the plaintiff did not furnish any proof which could guide the jury in considering whether the defendant was guilty of any negligence in this regard.

As electric cars may lawfully be run upon the streets, and may certainly maintain a fair rate of speed, it is not possible to establish an allegation of negligence in respect of speed without testimony showing a standard, and further testimony showing a breach of the standard, and no jury can have liberty to deal with such a question unless there is practical evidence in the case upon these subjects. In this case there was none.

All that the plaintiff said in her testimony in this connection was as follows, " Then the car came at full headway, then when the horse saw that he could not get backward, then he made a sudden turn and threw us out." On cross-examination she was asked, " Q. Did the horse do anything then ? A. He looked around, but the car was too quick in passing and he hadn't time to do anything; they were running fast. They went pretty fast past us."

Again she said, " Then as we came to the railroad, or crossed the railroad, they came swiftly past us, and then the boy put up his hands that they should stop, and said they should stop."

This was all of her testimony on the subject of speed, and the vice of it is, its utter inadequacy. Electric cars have a lawful right to go "fast," to go with " speed." The fact that they can do so is one of the great reasons of their being. When a witness says therefore in a given case that the car ran swiftly or with speed, he says nothing to the purpose when the inquiry is as to negligence in the rate of travel. Such testimony is altogether too uncertain for judicial action, and most especially

so when there was no collision but only the fright of a passing horse. In this case it is at best only the thought of the witness, and that witness the plaintiff, as to what is speed and what is swiftness. In her own case she might well think that any rate of movement would be speed or swiftness in order that she might recover, whereas other witnesses might well think that the same rate of movement was neither speed nor swiftness. The difficulty is that no means of contrast is afforded by such testimony, by which to distinguish between the rate of speed which is usual, or customary, or reasonably prudent, and that which is not so. Now as to this witness, she was examined on this very subject. On cross-examination she was asked, " Q. What is the regular speed of a street car? Do you know how fast they run," and she answered, " A. I cannot tell you that; that is something I cannot tell you. Q. You know nothing about that street, do you? A. I don't know how far they run. Q. Nor how fast they run, do you? A. I know nothing about them except that I seen them go." She added she often saw them run.

And now it is necessary to say that there is absolutely no other testimony in the case than the foregoing on behalf of the plaintiff, on the subject of the speed of the car.

Two other witnesses were called and testified for the plaintiff as to the facts of the accident. Neither of them said one word in regard to the speed of the car. They were not asked a single question upon that subject, and of course they gave no testimony in relation to it. On the question of the speed of the car therefore the case hangs alone upon the above two or three fugitive expressions of the plaintiff, and these admittedly not founded upon any knowledge as to what was the regular rate of speed of a street car.

But although the two witnesses called by her said nothing as to the rate of speed of the car, they did testify to some other facts which completely destroy the theory of the plaintiff on this subject, and also as to any negligence of the defendant being the cause of the fright of the horse.

The plaintiff's witness, Witters, who said he stood about thirty feet away from the place of the accident at the time it occurred, and saw it all, testified that he approached the place on foot, walking in the same direction in which the car was

moving, but in front of the car. The wagon was coming towards him and he saw it as it crossed the Cornwall road, after he had crossed the Cornwall and Lebanon road. The two roads were not far apart, about a square and a half, and the witness was walking from the Cornwall and Lebanon crossing toward the Cornwall crossing. He was asked: "Q. Had you crossed the Cornwall and Lebanon road already? A. Yes. Q. Where was the car? A. The car was coming along behind me. They stopped there to let somebody on or off at the gashouse somewhere. Q. Behind you? A. Yes behind me. Q. At that time you saw these people crossing the Cornwall road; was the wagon crossing the Cornwall railroad? A. Yes. Q. Then you walked on; did the car go ahead of you then? A. No, he could not because he had stopped there. I don't know who got on or off; I didn't pay no attention to that. Q. Did the car pass you? A. No, not till I got up to that accident; after the accident happened." After saying that his best judgment was that the distance between the two railroads was about a square and a half, he was asked: " Q. You walked there about that distance and the car hadn't caught up with you yet? A. No, not until I got there—we pretty near both came there together where I stood."

Thus it appears that the speed of the car was scarcely more than that of the witness while walking along the road, and in the face of this testimony given by the plaintiff's witness, it is quite preposterous to contend that the car was running at improper speed.

In addition however to this fact, both of the plaintiff's witnesses testified to another fact which is in entire hostility with any theory of negligence on the part of the motorman, either for disregarding signals, or for running at too great speed. The witness, Witters, testified that the horse did not commence shying until he was close to the cars, only twenty or thirty feet away. He was asked: " Q. Where did the horse first shy that you saw? A. When he got may be twenty or thirty feet away from the car. Q. Then he didn't shy all the way coming down the hill? A. No not till the car got close to him." The other witness, Doody, was asked : " Q. Now tell us as near as you can about how far the car and the team were apart when you saw the horse rear? A. It was right close to the team when the horse

began to rear up." He further said that twenty or thirty feet was what he called close. As a matter of course if the horse began to shy at no greater distance than twenty or thirty feet from the car there was no opportunity to stop the car before reaching the horse. The momentum of the car would carry it at least that distance before it could be stopped, in point of fact the car did stop at about that distance. To say judicially that a failure to cause an instantaneous stoppage of the car in such circumstances is negligence, would be a mere travesty of justice. No matter how many signals or calls to stop were made by the driver of the wagon in such a state of the testimony, they would utterly fail to establish the charge of negligence. The motorman was not responsible for the fright of the horse at sight of the car. He was not bound in advance to take precautions against a fright of which he had no knowledge, at least until he saw some evidence of the fright. As the plaintiff's own witnesses concur in saying that when the horse first shied he was only twenty or thirty feet from the car there was no opportunity to stop the car sooner than he did, and he was guilty of no negligence for not doing so.

The foregoing is the case of the plaintiff on the testimony adduced by herself, and it failed utterly to establish any negligence on the part of the defendant. It was the plain duty of the learned court below to grant the compulsory nonsuit which was asked for by the defendant's counsel at the close of the plaintiff's testimony.

This was not done and the trial of the case was proceeded with. It is only necessary to take a brief view of the testimony adduced by the defense to see how entirely destitute was the claim of the plaintiff. The motorman testified that the horse made no attempt at shying until he was by the side of the car, that he did not see the boy in the wagon wave his hand, and that he did not yell at all, also that he stopped the car as soon as he saw the horse shying. H. S. Berry, the conductor, said he saw the accident, that "Shiffler's team came along going east as we were going west, and when we were pretty near—when we were past, why the horse ran around and upset." He also said he saw no signs of the horse becoming unruly until after the car passed and that he heard nobody call out "stop."

J. I. Greeley, a disinterested witness, riding in the car, said: "I was sitting on the side when the team came along, and the horse and wagon as they came towards the car, the horse was prancing a little and the car was slacked down, and after the horse was past he ran around across the sidewalk over in the meadow . . . . and the wagon struck a stone or whatever was lying there and that upset the wagon." He was asked, "Q. Did you see the horse? A. Yes. Q. When did you first see him? A. When he came up over the railroad. When he came down approaching the car. Q. When did he commence to jump? A. He didn't prance much; you can't say that he jumped much when he passed the car. Q. When did he turn around? A. After he passed the car. Q. Did you hear any hollering of anybody to stop? A. I did not." After saying that he was watching the team coming and sat facing them, and that the horse shied only a little, until he passed the car, he was asked, "Q. You saw they were going slow? A. Yes, not full speed, nothing like it, because the car was slackened down considerably. Q. Was there any evidence of the horse being unmanageable that you noticed? A. No, sir, not when he passed the car. Q. Was there before he came to the car? A. No, sir, he acted just like a great many other horses." On cross-examination he said: "I was sitting that way (indicating), and I couldn't help but see just exactly what was going on, but there was not sufficient about the prancing to pay particular attention to it." He repeated that he was looking directly at the horse and could not help seeing him, and that the horse was not excited to any extent. Jacob Schmidt, another disinterested witness, riding on the car, said he noticed the horse and wagon approaching the car and added, "I observed the horse—he was within my vision for a period of ten seconds, possibly, until the team got directly opposite the car." "Q. How did the horse behave until he got opposite the car? A. I saw nothing unusual. I saw the horse prick up his ears, and saw him drive along at a moderate rate of speed, the way most horses would as they pass a car, until as nearly as I can tell, he got directly opposite the car. Q. Did you notice anything peculiar about the horse up to that time? A. Well nothing that I could say was peculiar, no, sir. Q. Well what occurred then? A. Well, without any previous warning, I

saw the horse wheel around shortly, a very short turn, and, as I found afterwards, one of the front wheels had caught on a stone of considerable size, and the wagon just turned right over on its side. Q. Was the car moving fast or slowly? A. I should judge at a moderate rate of speed. . . . Q. Was there anything unusual in the behavior of the horse? A. I saw nothing unusual in the behavior of the horse. . . . Q. Up to that time what was the rate of speed? A. A moderate rate of speed, I could not tell the rate."

This review of the testimony has been rendered necessary because the court was asked to direct a verdict for the defendant, under all the evidence, and also to charge the jury, in answer to the defendant's second point, that there was no proof that the car was run at an excessive and improper rate of speed and therefore the jury should find for the defendant. We are clearly of opinion that the second point should have been affirmed without qualification, and also the fifth point asking for a general instruction, under all the evidence, to find for the defendant.

The question of excessive speed was the one upon which the plaintiff's case depended entirely. Yet not a single witness, not even the plaintiff herself, gave any evidence that the speed was excessive. She merely said the car was moving fast—pretty fast—at full headway, and once she said swiftly. But that is not enough. In order to create liability on this ground, the evidence should show, and it should show clearly, either that the car was moving at an unusual rate of speed, or at a rate which was not reasonably prudent, or at a definite rate in miles per hour which would of itself show it was excessive, or at a rate greater than was allowed by the municipal ordinances, if there were any. But not a word of any testimony of this kind is in the case anywhere. The plaintiff is the only witness on her side who says a word as to the speed of the car. Her two witnesses say nothing about it, and the case stands upon the entirely inadequate and interested testimony of the plaintiff on the one side, and the disinterested testimony of four witnesses upon the other side, all of whom say that the car was going at a moderate rate of speed, one of them, the motorman, fixing it at five miles an hour. As to the action of the horse, the great weight of the testimony is that nothing occurred

until the horse and the car were very near together, and when according to the testimony of the plaintiff's witnesses, so near that the car could not have been stopped sooner than it was. It is to be regretted that cases so entirely destitute of real merit as this one is, should be permitted to go to the jury at all. We think the cause of justice would be much better subserved if the judges of the common pleas would in all proper cases where the testimony is manifestly insufficient, adjudge it themselves instead of submitting it to the jury. The assignments of error are all sustained.

Judgment reversed