No. 13,566.

MRS. JOHN SUNDMAKER VS. YAZOO AND MISSISSIPPI VALLEY R. R. CO.

<table>
<tr><td>106</td><td>111</td></tr>
<tr><td>109</td><td>47</td></tr>
<tr><td>109</td><td>49</td></tr>
<tr><td>109</td><td>911</td></tr>
<tr><td>106</td><td>111</td></tr>
<tr><td>e112</td><td>244</td></tr>
<tr><td>106</td><td>111</td></tr>
<tr><td>e115</td><td>468</td></tr>
<tr><td>103</td><td>111</td></tr>
<tr><td>120</td><td>1023</td></tr>
<tr><td>120</td><td>1025</td></tr>
</table>

SYLLABUS.

1. It is a question of fact to be determined from the evidence whether a railway train, moving within municipal limits, was being run at a rate of speed unsafe and dangerous to the general public—so much so as to amount in law to omission to use reasonable care to avoid accidents in general and the one in question in particular.

2. For, if the train was, considering all the circumstances, recklessly propelled, and to its high rate of speed is the casualty due, then there was fault on part of defendant amounting to *actionable* negligence.

3. It matters not that there was no statute or municipal ordinance regulating the rate of speed at which trains should be run in that part of the city. Because legislatures or town councils fail to act in this respect, does not give railway companies license to run trains recklessly fast through much used districts of a city.

4. The right to protection of life and limb is inherent, and is not affected by the omission of statutes, or by the non-existence of laws or regulations recognizing the right and guarding against its violation, or making provision for its enforcement.

5. The rule that the highest rate of speed consistent with the safety of their passengers is permissible to railway trains, has its exceptions, and one of these arises where a train enters the limits of a city or town where people congregate and pass to and fro in numbers. Then it is that those in charge of a train owe a duty quite as great to those on the outside as to those on the inside. Thus, while conveying their passengers in safety and with speed, the latter must be so regulated and controlled as to show due regard to the safety of those without the train, and especially is this true where the railway tracks are laid upon the streets and public places of the city.

**A** PPEAL from the Civil District Court, Parish of Orleans—*St. Paul, J.*

*A. E. & O. S. Livaudais,* for Plaintiff, Appellee.

*Gustave Lemle, Hunter C. Leake,* and *Farrar, Jonas & Kruttschnitt* (*J. M. Dickinson,* of counsel), for Defendant, Appellant.

The opinion of the court was delivered by BLANCHARD, J.

On application for rehearing, *Per Curiam.*

BLANCHARD, J. This is an action for personal injuries resulting in the death of John Sundmaker, a child two years of age.

The suit is brought by the widowed mother in her own right and as surviving parent and heir of the child. It embraces both causes of action as given in Act 71 of 1884.

It was tried before a jury in the court *a qua,* and from a verdict of ten thousand dollars in favor of the plaintiff, and a judgment of the court based thereon, this appeal is prosecuted.

The first plea tendered by defendant was an exception of no cause of action. It does not seem to have been passed on by the trial court.

This exception is leveled at the insufficiency of the allegations of the petition. The contention of defendant is that plaintiff has no case unless there was fault or negligence on its part producing the death of the child, and that the petition is lacking in the essential averment its death was due to omission of the agents of the company to use reasonable care to avoid the injury after they became aware of the child's presence on the track.

We find in the petition this allegation that:—

"A south bound train of cars, propelled by steam, in charge of defendant's agents, negligently, recklessly and wantonly propelled and traveling at a great degree of speed in front of your petitioner's dwelling, ran over, mangled, crushed and instantly killed petitioner's child," etc.

In a previous allegation it was set forth that the casualty had occurred within the corporate limits of the City of New Orleans.

While as a matter of pleading the meagerness of the averment quoted affords much justification for the criticism of defendant's counsel, the

allegation suffices to admit proof that the train of cars which killed the child was drawn through the city limits and across the locality where the casualty occurred at a high rate of speed.

It becomes, then, a question of fact to be determined from the evidence whether or not, considering the corporate environment, the locality, the surroundings and all the circumstances, the train was being run at a rate of speed unsafe and dangerous to the general public—so much so as to amount in law to omission on part of defendant to use reasonable care to avoid accidents in general and this one in particular.

Frick vs. Ry. Co., 75 Mo. 595.

For, if the train was recklessly propelled, if it were, considering that it had entered the city limits and was crossing an inhabited district and had reached a much-used locality, running too fast for safety to those who might cross or go upon its tracks, and to this high rate of speed is the death of the child due, then there was fault on part of defendant amounting to *actionable* negligence and a cause of action is disclosed. See Curley, Tutrix, vs. R. R. Co., 40 La. Ann. 816; McGuire vs. R. R. Co., 46 La. Ann. 1543; Norfolk vs. R. R. Co., 84 Va. 63,

It matters not that there was or is no statute or municipal ordinance regulating the rate of speed at which trains should run in that part of the city. Because legislatures or town councils fail to act in this respect, does not give railway companies license to run trains recklessly fast through thickly populated or much-used districts of a city.

In recognition of this, this court said in Houston vs. R. R. Co., 39 La. Ann. 797:—

"It would evince criminal negligence to move a train at a high rate of speed through cities, towns, or villages, or other places where people are accustomed to throng."

The right to protection of life and limb is inherent, and is not affected by the omission of statutes, or by the non-existence of laws or regulations recognizing the right and guarding against its violation, or making provision for its enforcement.

Coming to the merits of the case, defendant denies any negligence on part of its agents resulting in the death of the child, and avers that the proximate cause of its death was the negligence of the plaintiff.

As to the latter the contention is that the child was a trespasser upon the railway track and that plaintiff was guilty of negligence in allowing it to be there unattended.

It is insisted that the engineer of the train did not and could not see the child in time to prevent the casualty and thus was not at fault.

The child was run over by defendant's passenger train about 9:20 o'clock on the morning of October 20, 1899.

The place of the accident was within the corporate limits, and the train was coming into its depot in the city.

It had entered the municipal limits about three-quarters of a mile from where the child was run over, and had only about two miles to go before reaching its depot. Its speed at the time of the accident was between thirty and forty miles an hour.

The plaintiff with her child was living at the home of her brother-in-law. The house, a small one, was about 50 or 60 feet from the railway track. This track, at that point, is located on Colapissa street, between Carrollton avenue and Dublin street, and practically occupied the street with its embankment and road-bed. There is no roadway for vehicles there, but a great many pedestrians pass along the street, in the main using the railway track, which is gravelled and affords good walking.

Carrollton avenue is a very important thoroughfare of the city. Dublin street is not greatly used where it crosses Colapissa street. The distance between Carrollton avenue and Dublin street is about six hundred feet.

The place where the child got upon the track is about 250 feet from and north of Carrollton avenue. The train that struck it was coming south towards the avenue and, therefore, ran over the child just before reaching Carrollton avenue.

The mother was engaged in scrubbing a room. The child was with her in the house, playing around. He appears to have left the room unknown to her and passing out, crossed ten or fifteen feet of intervening yardway, passed through or under an old dilapidated fence and gone upon the railway track, where it was run over and instantly killed.

The fence referred to appears to have divided the street, or, practically, the railroad right-of-way, from the lot the house was located on. It had been put there by the railway company and it is in evidence that it was looked after in the matter of repair by the section foreman of the company. But it was very much out of repair at the time in question, for the child appears to have had no difficulty in getting through it on its way to the track. There was no gate for it to pass through.

From the point where the child was killed the track was straight for

1200 feet in the direction from which the train was approaching. It was clear and free from anything to obstruct the view.

The curve around which the train came to the straight stretch of 1200 feet was a gradual one.

The child on the track could and should have been seen by the engineer as soon as the locomotive emerged from the curve, even though it were, as the testimony shows, in a stooping position.

The preponderance of evidence is to the effect it could have been seen.

One witness who was walking on the track south of the child a distance of two and a half blocks (say about nine hundred feet) saw the child before and at the moment the train struck it and easily made it out as a child.

Two other witnesses standing on the south side of Carrollton avenue 300 feet from the child saw it and readily recognized it as a child.

Yet the engineer says he discovered the object upon the track only about four hundred feet before he reached it and *did not make it out as a child* until within 150 feet of it. It was then too late to avoid the casualty; too late at the time he first noticed the object 400 feet away. At the rate the train was running it could not be stopped under 700 feet.

The engineer made no effort to check the train until he made out the object to be a child. Then he used every means in his power to stop it, but the proof is that it was not stopped under 800 feet from the point of contact.

He states, in explanation of the fact that he made no effort to stop the train when he first noticed the object, that the child was lying down on or between the cross ties at one end of same, and he thought it was a dead dog or goat or chicken, and did not distinguish it as a child until it raised its head.

But it is otherwise established that the child was not lying down on the track; it was standing on it in a stooping position and recognizable as a child.

We are satisfied "the object" on the track could and should have been recognized as a child 600 feet away at least, and had the train been running at a moderate rate of speed, say not faster than 15 miles an hour, as we hold it should, it could have been stopped in time and the casualty avoided.

As the train emerged from the curve, heretofore spoken of, it came

at once into a locality where people live. and where it was to be expected, and where the proof shows, the track would be crossed and much walked upon.

Thirteen or fourteen hundred feet from this curve is Carrollton avenue, on which a double track electric railway is located, with cars passing every few minutes. A great many people besides those who use the cars pass along the avenue, and as many as 1200 or 1500 vehicles each day cross the railway track where it intersects the avenue. This was the situation at the time of the accident.

In view of its near approach to the crossings at Dublin street and Carrollton avenue and the populous character of the locality, the train should have been slowed down to a much more moderate rate than was the case in passing over the curve, and should have been run at not exceeding half the speed used as it passed over the crossings alluded to, and for the rest of its way to that point near its depot where a city ordinance requires its speed to be diminished to six miles an hour.

Indeed, as soon as this train entered the city's limits, shown to have been only three-quarters of a mile from where the casualty occurred, it would have been the part of prudence to have moderated its speed to half the rate the evidence shows it was running at when the child was struck.

We hold that a speed of 30 miles an hour where the child was killed was a dangerous rate, and this, together with the engineer's failure to seasonably see and distinguish the child, was the proximate cause of its death.

If the City Council did not, by ordinance, require a much more moderate rate of speed, the company should have, of its own motion, made a regulation to that effect.

It was at fault in not so doing, and must abide the consequences.

The rule that the highest rate of speed consistent with the safety of their passengers is permissible to railway trains, has its exceptions, and one of these arises when a train enters the limits of a city or town, where people congregate and pass to and fro in numbers. Then it is that those in charge of the train owe a duty quite as great to those on the outside as to those on the inside.

Thus, while conveying their passengers in safety and with speed, the latter must be so regulated and controlled as to show due regard to the safety of those without the train who pass to and fro over the track and sometimes temporarily make use of the same by walking up and

down it—something always to be anticipated in cities. Especially is this true where the railway tracks are laid upon the streets and public places of the city.

With regard to the amount of damages to be awarded, the verdict of the jury is excessive. The mother has sued on both causes of action allowed by the statute—that which the law gives her in her own right, and that which she inherits from the child as its heir. We think on both causes combined she should have the sum of five thousand dollars, and that to this extent the award of the jury should be reduced.

We are not of the opinion that the mother is to be considered as having, by want of care, contributed to the child's death, and thus barred herself from recovery, as was the rule laid down in the Levis case, 43 La. Ann. 63.

We think the verdict should be reduced to five thousand dollars, and, accordingly, it is ordered, adjudged and decreed that the judgment appealed from be amended by reducing the same from ten thousand dollars to five thousand dollars, and as thus amended the same is affirmed —costs of appeal to be borne by plaintiff and appellee, those of the lower court by defendant and appellant.

PROVOSTY, J., takes no part.

## ON APPLICATION FOR REHEARING.

### Per Curiam.

A further consideration of the case, on the application for rehearing filed, has led to the conclusion that a further reduction in the judgment should be made and that its amount should be fixed at four thousand dollars instead of five thousand dollars. Accordingly, it is ordered that the decree heretofore entered be vacated, and it is now adjudged and decreed that the judgment appealed from be amended by reducing the same from ten thousand dollars to four thousand dollars, with legal interest from April 30, 1900, and, as thus amended, the same be affirmed —costs of appeal to be borne by plaintiff and appellee; those of the lower court by defendant and appellant.

Rehearing refused.

MONROE, J. I dissent from the refusal of the court to grant a rehearing.