MODIFIED.

---

Argued 11 July, decided 20 August, 1907.

## WOLF v. CITY RAILWAY CO.

85 Pac. 620, 91 Pac. 460.

APPEAL—TIME FOR FILING TRANSCRIPT—POWER OF COURT.

1. Section 553, B. & C. Comp., providing for appeals to the supreme court, and authorizing the court, upon the appeal being perfected, to extend the time for filing the transcript, does not require that the undertaking on appeal must be filed before an order can be taken enlarging the time to file the transcript, but only that such order must be taken before the expiration of time already allowed for that purpose.

TRIAL—DUTY OF COURT TO REJECT UNREASONABLE TESTIMONY.

2. Where the undisputed circumstances show that the testimony of a witness is so improbable and unreasonable that a fair mind must reject it, the court should withdraw such testimony from the jury.

STREET RAILROADS—INJURY TO PERSONS ON TRACK—EVIDENCF.

3. In an action for the death of plaintiff's intestate, caused by his being struck by a street car, evidence examined, and that of a certain witness for plaintiff *held* not so opposed to all reasonable probabilities as to require its exclusion, as a matter of law, from the jury.

STREET RAILROADS—INJURY TO PEDESTRIAN AT CROSSING—CONTRIBU-
TORY NEGLIGENCE OF PERSON INJURED.

4. A person about to cross a street at a crossing is not bound to wait because a car is in sight ; but if the car is at such a distance that he has time to cross, if it is run at the usual speed, it is not negligence, as a matter of law, to attempt to do so.

STREET RAILROADS—ACCIDENT AT CROSSING—CARE REQUIRED.

5. It is the duty of a street railway company, in operating its cars at street crossings, to use such care as is proportionate to the danger likely to be encountered, regardless of whether the rate of speed has been limited by statute or ordinance, or not.

SAME—REASONABLENESS OF SPEED IS FOR JURY.

6. Whether a given speed was reasonable for a street car in a large city at a crossing in a residence district is a question that should be submitted to the jury.

SAME—EVIDENCE—SUFFICIENCY.

7. That at the time a pedestrian was struck by a street car there were seven persons at or near the crossing justifies an inference that the street was much used.

RAILROADS AND STREET RAILROADS—RULES AS TO SPEED.

8. The rules governing the management and speed of steam railroads and electric street railways are not always the same, and a rule that is applicable to one may not be controlling against the other.

APPEAL—REVIEWING REFUSAL TO REDUCE VERDICT.

9. The action of a trial court in reference to a motion to set aside a verdict as excessive is not subject to review on appeal.

From Multnomah: ALFRED F. SEARS, JR., Judge.

Action by Mollie Wolf, administratrix of the estate of Isaac Wolf, deceased, against the City & Suburban Railway Co. Judgment for plaintiff, and defendant appealed. A motion to dismiss the appeal was overruled, after which the case was heard on the merits.    MOTION DENIED: AFFIRMED.

Decided 12 June, 1906.

ON MOTION TO DISMISS THE APPEAL.

85 Pac. 620.

*Mr. Alexander Bernstein* for the motion.

*Mr. Ossian Franklin Paxton* and *Mr. William P. Lord,* contra.

PER CURIAM: Motion to dismiss an appeal because the transcript was not filed within the time allowed by law. The judgment from which the appeal was taken was rendered on October 7, 1905, and a notice of appeal thereupon given in open court. Thereafter and on the same day an order was made by the trial judge enlarging the time 60 days in which to file the transcript. On October 17, 1905, the undertaking on appeal was filed. On December 2d, a further order was made extending the time in which to file the transcript, and similar orders were subsequently made, each within the time allowed by the previous order, until February 26, 1906, when the transcript was filed in this court. The statute provides, in effect, that upon the appeal being perfected the appellant shall, within 30 days, or within such an extension of time as the trial court or judge thereof, or the Supreme Court or a justice thereof, may allow, file with the clerk of this court a transcript or such abstract as the rules of the court may require, but that the order enlarging the time "shall be made within the time allowed to file the transcript": B. & C. Comp. § 553. It is argued in support of the motion to dismiss that, under this statute, an order enlarging the time in which to file a transcript cannot be made by the trial court or judge thereof until after the appeal is perfected by the filing of an undertaking and the expiration of the time in which to except to the sureties thereon, and that such is the meaning of the words "within the time allowed to file the transcript," and therefore the order of October 7th was null and void, and as no transcript was filed within 30 days after the appeal was perfected, nor an order obtained within that period extending the time in which to file the transcript, the appeal should be dismissed. But this is too technical a construction of the statute to meet with our approval. The act of 1899 (Laws 1899, pp. 227, 229), which includes said Section 553 and is now in force governing the procedure on appeal, was designed to simplify such procedure, and to remove many of the technicalities with which it was hedged about prior to that time. It should, therefore,

receive a liberal construction to accomplish the end intended. The provision that an order enlarging the time "shall be made within the time allowed to file the transcript" simply means that it should be made before the appellant is in default: *Tallmadge* v. *Hooper*, 37 Or. 503, 508 (61 Pac. 349). And there is no valid reason why the trial court or judge thereof should not make such an order after the notice of appeal has been given, and before the appeal is perfected by the filing of an undertaking.                              MOTION DENIED.

Decided 20 August, 1907.

ON THE MERITS.

91 Pac. 460.

For appellant there was a brief over the names of *O. F. Paxton* and *William P. Lord,* with oral arguments by *Mr. Lord* and *Mr. Ephraim Baynard Seabrook.*

For respondent there was a brief with oral arguments by *Mr. Alexander Bernstein* and *Mr. D. Solis Cohen.*

Opinion by MR. JUSTICE MOORE.

This is an action by Mollie Wolf, as administratrix of the estate of her husband, Isaac Wolf, deceased, against the City & Suburban Railway Co., a corporation, to recover damages resulting from his death, which was caused by his being struck by one of the defendant's cars, August 26, 1902, in the City of Portland. The negligence alleged as a basis for the recovery is that the car causing the injury was being run down a steep incline on First Street, from Montgomery to Mill Street, at a reckless, dangerous and excessive rate of speed, and without any warning being given of its approach to the crossing at Mill Street, by reason of which carelessness, and without any fault on his part, Wolf sustained the injury at the intersection of First and Mill streets, a public crossing, which resulted in his death. The answer denies the material allegations of the complaint, and avers that at the time of the accident the defendant's agents and servants were exercising due care and

caution in conducting and managing the car, and that the hurt complained of was caused by the contributory negligence of plaintiff's intestate. The reply put in issue the allegations of new matter in the answer, and, the cause being tried, judgment was rendered against the defendant for the sum of $5,000, and it appeals, assigning as error, *inter alia,* the action of the court in refusing to grant a judgment of nonsuit at the conclusion of plaintiff's case, and in denying a request to direct the jury to return a verdict for the defendant when all the testimony had been submitted.

A former judgment in this action for the sum of $500 was reversed in consequence of the court's refusal to grant a nonsuit: *Wolf* v. *City Railway Co.* 45 Or. 446 (72 Pac. 329, 78 Pac. 668). The testimony produced at the last trial is substantially the same as that given at the prior hearing, except that one S. Price, who had not theretofore been called by either party, appeared as plaintiff's witness; and hence a determination of the errors alleged must rest upon a consideration of his declarations under oath, when examined in connection with other evidence. Before reviewing his testimony, however, it is deemed proper to call attention to the *locus in quo* where the injury occurred. The testimony shows that First Street, in the City of Portland, extends northerly on a downgrade from Montgomery to Mill Street, which highways cross it at right angles, and the blocks situated between the intersecting cross-streets are 200 feet in length, and the streets mentioned 60 feet in width; that the defendant owns two parallel tracks on First Street, the rails of each of which are placed 3 feet and 6 inches from center to center, and the space between the two tracks is 5 feet and 8 inches from center to center, of the rails; that the cars, which are operated by electricity, in going north run on the east track, and those proceeding in an opposite direction pass over the west line; that double-truck car No. 64, which struck the decedent, is 28 feet long, and 34 persons can be seated therein, but at the time of the injury there were on the car 53 passengers, a motorman and a conductor:

Price's testimony is to the effect that at the time of the accident he was standing, with others, at the northeast corner of First and Mill streets, awaiting the approach of a car going north, to become a passenger thereon; that he first saw Wolf going south on the west side of First Street and thence nearly across Mill Street, where he turned southeasterly to the south cross-walk on the latter street, and as he reached the west line of the rails the witness first saw the car up the hill coming down fast; that he did not hear any bell rung, nor was the speed of the car slackened; that when Wolf reached the east line of rails the car was about 50 feet south of Mill Street, and before he could cross the track he was struck and injured by the car, which passed entirely across the street before it was stopped. On cross-examination the following questions were asked, and responses thereto made:

"Q. Where was the car when you first saw it?

A. I saw it about Montgomery Street, as soon as it came up the hill. * *

Q. Was it at Montgomery Street when you saw it first?

A. That is something I could not tell you.

Q. Will you swear it was as far up as Montgomery Street when you first saw it?

A. I could swear it was a block away when I seen it.

Q. Where was Mr. Wolf when you first saw the car?

A. He was on the first track—on the west track.

Q. When you first saw the car, Mr. Wolf was then on the west track, the one the cars run up on?

A. Yes; on the west track.

Q. And where was the car then? How far up?

A. A block.

Q. Up at Montgomery Street, one block away?

A. Yes.

Q. Was Mr. Wolf walking at a tolerably brisk speed, or was he going very slowly?

A. He was walking pretty briskly.

Q. And he walked right along all the time and did not stop?

A. Yes.

Q. You looked at him all the time?

A. Yes. * *

Q. When Mr. Wolf came up the track, did you notice whether he looked up or down to see whether there was any car coming?

A. I noticed that he kind of looked in the beginning of his going on Mill Street. I noticed that when he went in on Mill Street—I noticed that when he went in to cross on Mill Street —he turned in and looked a little to see if any car was coming. * *

Q. Was there anything to obstruct his view, if he looked up the street from where he was?

A. Nothing in the way. It was uphill.

Q. There was nothing in your way?

A. Nothing in my way."

2. It is argued by defendant's counsel that Price's testimony is so opposed to all reasonable probabilities as to require its exclusion as a matter of law from the jury, leaving the case as it stood at the former appeal; and, this being so, errors were committed as alleged. There are certain facts of such general notoriety that they are assumed to be known by a court without any proof thereof (B. & C. Comp. § 719), and if the testimony of a witness transcends the laws of nature it is undoubtedly the duty of a court to withdraw such testimony from the consideration of the jury: *Smitson* v. *Southern Pac. Co.* 37 Or. 74 (60 Pac. 907). Thus, in *Blumenthal* v. *Boston & Maine Railroad,* 97 Me. 255 (54 Atl. 747), it was ruled that, when the undisputed circumstances show that the story told by a witness upon a material issue cannot by any possibility be true, it is incumbent upon the court to take such testimony from the jury. In that case the plaintiff was hurt by a collision with the defendant's train, after he had successfully crossed two of its tracks; and in referring to the circumstances of the injury, as detailed by the party suffering therefrom, Mr. Chief Justice WISWELL makes the following observation: "The plaintiff, according to his own testimony, was driving at a fast walk, and witnesses for the plaintiff testified that in their judgment the speed of the freight train was from 15 to 20 miles an hour. Assuming these estimates to be correct, when the plaintiff was upon the first track, with an unobstructed view of the railroad

easterly for a distance of between 300 and 400 feet, the train was only from 125 feet to 150 feet distant from the crossing, because the speed of the train was only five or six times that of the plaintiff, and they came into collision after the plaintiff had traveled a distance of 25 feet. Consequently, when the plaintiff was upon the first track, 25 feet distant from the place of collision, he had an unobstructed view of the approaching train, which was not more than 150 feet distant on the track from the crossing. If the relative speed of the freight train was not as great as the witnesses have estimated, then, of course, the train was still nearer the crossing at the time the plaintiff was upon the first track. There is no controversy about these facts. They are shown by the testimony introduced by the plaintiff, and by the plan which the plaintiff used and which is made a part of the case. From these facts one of these two conclusions is irresistible: Either the plaintiff failed to take such precautions as to looking and listening before attempting to cross the third track as have been laid down by all authorities as indispensable to his right of recovery, or else he did look and saw the approaching train, and took his chances of safely crossing in front of it. In either event his negligence contributed to the accident, and in accordance with the settled law of this state that negligence will prevent his recovery."

In *Spiro* v. *St. Louis Transit Co.* 102 Mo. App. 250 (76 S. W. 684), Mr. Justice GOODE, discussing the legal principle under consideration, remarks: "Verdicts resting on evidence which looks contrary to the ordinary course of nature are not infrequently set aside, and retrials directed, by appellate courts, as a proper precaution against an unjust outcome of litigation. While it is fundamental that juries must weigh evidence and trial judges revise their findings, instances happen in which, from one cause or another, this practice so obviously failed to work out a right result that an imperative call is heard to supplement it by an exceptional procedure in order that justice, the end of all procedure, may not be frustrated. This prerogative of courts of error is sparingly employed; but that

it exists, as an emergency expedient for the correction of verdicts palpably wrong, is certain. The appropriate use of it does not require a court to be convinced that the jury found an event to have occurred that was physically impossible or miraculous. It is enough if the event found was so improbable according to the ordinary operation of physical forces, or was so overwhelmingly disproved by credible witnesses, as to compel the conviction that the jury either failed to weigh the evidence carefully, or drew unwarranted inferences, or yielded to a partisan bias." So, too, in *Stafford* v. *Chippewa Valley Elec. R. Co.* 110 Wis. 331 (85 N. W. 1036), Mr. Justice MARSHALL, commenting upon the claim respecting the relative speed of a car and of a vehicle in which the plaintiff was riding, says: "The idea that the car moved from a point where it was out of sight from plaintiff's point of view when she looked to where it was when the horses became frightened, a distance of some 275 feet, while the horses traveled but about 20 feet, making the speed of the car somewhere about 50 miles per hour, or twice as great as the most extravagant testimony of plaintiff's witnesses puts it, is as well within the bounds of the ridiculous, we venture to say, as anything that has heretofore received serious consideration by a trial court or jury. We cannot believe for a moment that the learned trial court or the jury believed that such a thing could be within reasonable probabilities, or that the case was submitted to the jury upon any such theory."

3. The defendant's counsel, invoking the rule enunciated in the cases from which the foregoing excerpts have been taken, insist that, as it appears from Price's sworn statements Wolf passed from the west rail of the west track to a point about 12 inches east of the east rail of the east track, a distance of 13 feet and 8 inches, where he was struck by the corner of the car, while it was going from Montgomery Street to Mill, a space of 200 feet, shows that the car must have traveled more than 14 times faster than he did; and, assuming that Wolf walked at the moderate rate of 3 miles an hour, when the

witness said, "He was walking pretty briskly," demonstrates
that the car was going at a greater rate of speed than 42 miles
an hour, which conclusion is so improbable as conclusively to
show that the testimony given by Price, as an attempt to estab-
lish a probative fact, is worthless, and should have been rejected
as false, and hence an error was committed in denying the
motion for a judgment of nonsuit.   It was admitted at the
trial that, though the streets where the accident occurred are
60 feet wide, the distance from curb to curb of such highways
is only 36 feet, and, as Price was standing at the northeast
corner of First and Mill streets, he must at least have been
more than 36 feet north of where Wolf was at the time the
latter was injured.   It will be remembered that Price testified
that when he first saw the car Wolf was by the west track, and
that the car was then about at Montgomery Street.   On cross-
examination he was asked, "Was it at Montgomery Street
when you saw it first?" and answered, "That is something I
could not tell you."   He further said, "I could swear it was
a block away when I seen it."   In reply to the inquiry, "Up at
Montgomery Street, one block away?" he said, "Yes."   If
Price's last answer can be construed as definitely locating the
car at Montgomery Street when Wolf had reached the west
track, the inference which the defendant's counsel seek to estab-
lish from the testimony of this witness would seem to be deduc-
ible.   The jury, however, who heard Price testify, may have
observed that he did not give proper attention to that inquiry,
and, if so, they had a right to compare and weigh his entire
testimony, and were warranted in concluding that he intended
to convey the idea that when he first saw the car it was about
200 feet from him, and therefore at least 36 feet nearer Wolf.
If it were conceded that the car passed over 164 feet of track
while Wolf was walking 13 feet and 8 inches, the car would
necessarily have attained a velocity 12 times greater than that
of the deceased, or 36 miles an hour, if he walked 3 miles in
that time.   Price's frequent use of the word "about," when
employed to qualify the distance to which he referred, convinces

us that he did not intend definitely to locate the position of the car at any particular time with reference to Wolf's movements. If the rate of speed which the car acquired as it ran heavily loaded down an incline was definitely known, and Wolf's relative position with reference to it certain at all times until he was injured, it might be possible to determine whether or not Price's testimony violated the laws of nature; but in the absence of such information we believe a fair construction of his sworn statements shows that they are not so improbable as to have warranted a declaration by the trial court, as a matter of law, that his testimony was unworthy of belief.

In *Blumenthal* v. *Boston & Maine Railroad* and in *Stafford* v. *Chippewa Valley Elec. R. Co.*, to which cases reference has hereinbefore been made, there was no conflict of testimony as to the rate of speed of the train and car respectively causing the injury, while in the case at bar that question is controverted. In order clearly to understand this branch of the subject, a statement of the defendant's theory of the cause and manner of the injury is deemed appropriate. No witness was called at the last trial by the defendant, but its counsel read to the jury the testimony given on behalf of their client at the prior hearing. This evidence is set out with some particularity in the former opinion (*Wolf* v. *City Ry. Co.* 45 Or. 446: 72 Pac. 329, 78 Pac. 668), and may be thus summarized: As the car was going north about 10 o'clock in the forenoon of August 26, 1902, which was a dry day, Wolf was seen crossing First Street, at the south line of Mill, whereupon the motorman immediately rang the bell and applied the brakes, checking the speed of the car from 8 or 10 miles an hour to 3 or 4, during that period of time; that when Wolf reached the west track, where his view was unobstructed, he halted as if to permit the car to pass, and the motorman then released the brakes and the car started ahead, but when it was within about 7 or 8 feet south of the crossing Wolf suddenly attempted to pass in front of it, whereupon the brakes were firmly applied, but the motorman was unable to stop the car in time to prevent the

accident, or until the front trucks had just passed over the north crossing of Mill Street. C. F. Swigert, who was, and for several years prior to the accident had been, the manager of the defendant corporation, testified, as its witness, that he was acquainted with the practical working of an electric car and knew the manner of stopping one, and that, in his opinion, the shortest distance in which such a car could be stopped that was running at the rate of 6 miles an hour was 30 feet, at 8 miles an hour 40 feet, and at 10 miles an hour 50 feet. Joseph Friedman, as plaintiff's witness, testified that after striking Wolf the car was not stopped until its rear end was about two lengths of the car, or 56 feet, north of Mill Street. Joseph Ruvensky, testifying for the plaintiff, said the car passed entirely across that street before it was stopped. Mrs. Alice Walker, as a witness for the same party, testified that the car was stopped below the crossing. Mrs. Mary Park, as the defendant's witness, testified that she was a passenger on the car at the time Wolf was injured, and on cross-examination, in referring to the place where the car was stopped after the accident, she stated, "I think it was about the middle of the block, or across over the crossing."

Assuming the fact most strongly against the plaintiff, that her husband was struck while he was at the extreme north line of the south cross-walk of Mill Street, the car ran across the remainder of that highway, or 48 feet, and if Friedman's testimony is to be believed the front end of the car, which was the line of contact, was not stopped until it had gone three times the length of the car, or 86 feet, below the crossing, thus making the entire distance, according to his estimate, 132 feet over which the car passed before it was stopped after causing the injury. If Mrs. Park's opinion is accepted, however, the intervening space over which the car passed after the accident, before it could be stopped by the motorman, who testified that he set the brakes as hard as he could, was 148 feet. As the speed of a car may reasonably be determined by the distance which it covers on the rails before it can be stopped, when the brakes

are properly applied, and as the rate per hour is ascertained, as explained by Swigert, who is an expert in such matters, to be equivalent to one-fifth of such distance, the jury were authorized to infer from the testimony admitted that the car was running at the rate of 26.4 or 29.6 miles an hour when the injury occurred, and that in the management of the instrumentality the defendant's agents and servants were negligent: *Marden* v. *Portsmouth, K. & G. St. Ry. Co.* 100 Me. 41 (60 Atl. 530: 69 L. R. A. 300: 109 Am. St. Rep. 476) ; *Chisholm* v. *Seattle Electric Co.* 27 Wash. 237 (67 Pac. 601). Such deduction, when compared with Price's testimony, convinces us that no error was committed in submitting his sworn statements to the jury for their consideration. We are confirmed in this view by the testimony of Joseph Ruvensky, who, having stated that, at the time of the accident, he was on the west side of First Street going north; that he heard the car back of him, and at the same time saw Wolf crossing the south side of that street, was asked, "When you first saw Mr. Wolf at that time, how far up the street were you on the west side?" and he replied, "I was about half a block." On cross-examination, the defendant's counsel, referring to Wolf, inquired, "How far was he from the curb on the west side when you first saw him?"

The witness answered:

"The first time I saw him, he was at the first track, passing. * *

Q. How many steps did he take before the car came in sight?
A. He was crossing. He was in the middle of the track, and crossing the tracks.

Q. That is the position he was in when the car passed you?
A. When the car passed me I did not see him.

Q. You did not see the car pass you?
A. I saw the car pass, but I did not see Mr. Wolf at that time.

Q. How far was the car from the crossing when it passed you?
A. The car was about three houses from the baker shop.

Q. Then that was three houses above the baker shop, and the

baker shop and another house on the corner, so that would make it about five houses. The car was about five houses away?
    A. Yes."

4. In referring to the testimony last quoted, the defendant's counsel make the following statement in their brief, to wit:

"The usual width of houses is 16 feet, which would place him (Ruvensky) 80 feet from the corner, where he saw Wolf crossing the track, when the car was so far behind him and up the street that he could not see it without looking around, nor did he see it until it afterwards passed him. Now, if the car was running at the rate of speed to which he testified, it must have been at least 30 feet further back, which would place the car not less than 100 feet from the crossing where Wolf was seen by Ruvensky in the act of crossing."

No testimony was offered tending to show the width of the houses mentioned, nor did Ruvensky indicate the rate of speed which the car attained, except to state that it was going fast, and that it was about two seconds after it passed him before Wolf was struck by it. It is impossible accurately to determine from Ruvensky's testimony how far south of Mill Street the car was when he first saw Wolf, or how far the witness was at that time from the street corner, except his estimate as to the latter distance, that it was about half a block, or 100 feet, and the car still further behind him. "A person about to cross a street at a regular crossing," says Mr. Justice FELL, in *Callahan* v. *Philadelphia Traction Co.* 184 Pa. 425 (39 Atl. 222), "is not bound to wait because a car is in sight. If a car is at such a distance from him that he has ample time to cross if it is run at the usual speed, it cannot be said as a matter of law that he is negligent in going on." So, too, in *Philbin* v. *Denver City Tramway Co.* 36 Colo. 331 (85 Pac. 630), Mr. Justice MAXWELL, in speaking of the measure of care demanded from a traveler on a public highway, asserts: "It is not negligence *per se* for one to cross a street railway track in front of an approaching car, which he has seen and which is not dangerously near." If the jury believed the testimony of Ruvensky and of Price, they had the right to conclude that the approach-

ing car was not dangerously near when Wolf attempted to cross the tracks in front of it, and they also had the right to find, from the testimony of plaintiff's witnesses, that the gong was not sounded, nor any effort put forth to check the speed of the car.

5. No ordinance limiting the rate of speed of a street car in Portland having been offered in evidence, nor any testimony produced tending to show what is the standard of legitimate speed for an electric car on First Street in that city, Mr. Seabrook, of counsel for the defendant, called attention at the trial to the case of *Yingst* v. *Lebanon & A. St. Ry. Co.* 167 Pa. 438 (31 Atl. 687), as establishing the rule governing the case at bar. In that case the plaintiff was injured by the upsetting of a wagon in which she was riding, occasioned exclusively by the fright of the horse which was drawing the vehicle. The negligence alleged was that the car was running at an excessive rate of speed, which caused the fright of the animal and thereby occasioned the injury. In rendering the decision, Mr. Justice GREEN, speaking for the court, in referring to the plaintiff's witnesses, says: "Not one of them was even asked the question whether the speed of the car was greater than was allowable for an electric car to run, or whether they had any knowledge upon that subject. No experts in such matters were called to testify as to what would be a reasonably prudent rate of speed for such a car over such a street, and, in short, no evidence whatever was given upon that subject. Nor was any evidence given for the plaintiff as to the actual rate of speed at which this car was run, and therefore the plaintiff did not furnish any proof which could guide the jury in considering whether the defendant was guilty of any negligence in this regard." Further in the opinion it is observed: "Electric cars have a lawful right to go 'fast'—to go with 'speed.' The fact that they can do so is one of the great reasons of their being. When a witness says, therefore, in a given case, that the car ran swiftly or with speed, he says nothing to the purpose when the inquiry is as to negligence in the rate of travel. Such testimony is

altogether too uncertain for judicial action, and most especially so when there was no collision, but only the fright of a passing horse." In *Harkins* v. *Pittsburg, A. & M. Traction Co.* 173 Pa. 149 (33 Atl. 1045), it was held that the rule thus announced was not applicable where a person was injured by being struck by a car. The court, referring to the legal principle invoked, say: "The circumstances of the two cases are not alike, and the degree of care required was not the same. In one case the speed of the car was wholly unimportant, except as it contributed to causes which produced an unexpected result, the fright of the horse; in the other, the rate of speed was of primary importance, as indicating the degree of control which the motorman exercised over the movements of the car in a crowded street, and when in a position demanding a high degree of care." It is incumbent upon a street railway company, in operating its cars at public crossings, to use ordinary care to avoid injury; that is, such a degree of solicitude for the welfare of others as persons of average prudence would exercise, in view of the danger reasonably to be apprehended and of the consequences of accidents resulting therefrom.

6. Excessive speed at such places augments the danger of collision with travelers, and, as it might reasonably have been inferred from the testimony produced at the trial that at the time of the accident the car causing the injury was running at a rate of 26 or 29 miles an hour, the court could not say, as a matter of law, that the speed was reasonable, and hence it was its duty to submit that question to the jury for their consideration: *Davis* v. *Concord & M. R.* 68 N. H. 247 (44 Atl. 388). The rule thus announced is applicable in thickly populated or much-used districts, regardless of the fact whether or not a statute has been enacted or a municipal ordinance adopted limiting the rate of speed: *Sundmaker* v. *Yazoo & M. V. Ry. Co.* 106 La. 111 (30 South. 285).

7. Though the accident occurred in the City of Portland, no testimony was offered tending to show the number of people who lived in the vicinity of First and Mill streets, or to esti-

mate the persons who might reasonably be expected to cross the defendant's tracks at that intersection. It does appear, however, that at the time of the injury seven persons were on the street at or near the crossing, and from that number the jury had the right to infer that the highway was much used.

8. In *Golinvaux* v. *Burlington, C. R. & N. Ry. Co.* 125 Iowa, 652 (101 N. W. 465), it was ruled that, in the absence of an ordinance regulating the rate of speed, a train running in the suburbs of a city across a street at the rate of 60 or 65 miles an hour was not of itself negligence, but was a circumstance to be submitted to the jury, with other evidence tending to show that the view of a traveler was obstructed at that crossing and that no bell was rung. Whether or not such excessive velocity of a train in the outlying districts of a city is not *per se* negligence, even in the absence of a municipal ordinance regulating the rate of speed, need not now be considered; for the principles of law governing the management of trains propelled by steam power and regulating cars operated by electricity are not identical: *Marden* v. *Portsmouth, K. & Y. St. Ry. Co.* 100 Me. 41 (60 Atl. 530: 69 L. R. A. 300: 109 Am. St. Rep. 476). In that case it was determined that the rule promulgated in *Blumenthal* v. *Boston & Maine Railroad,* 97 Me. 255 (54 Atl. 747), hereinbefore noted, was not applicable. We conclude, therefore, that the rule invoked is not appropriate to the case at bar, and that Wolf, when he attempted to cross the street, had the right to assume that the car, which was at such a reasonable distance, would permit him to do so, if run at the usual rate of speed (*Hamilton* v. *Consolidated Traction Co.* 201 Pa. 351: 50 Atl. 946) ; and hence no error was committed in refusing to instruct the jury to find for the defendant.

9. It is maintained by defendant's counsel that the judgment given is excessive, and for that reason an error was committed in refusing to set the verdict aside and to grant a new trial: In *Lindsay* v. *Grande Ronde Lum. Co.* 48 Or. 430 (87 Pac. 145), it was ruled that the refusal of a trial court to set aside a verdict as excessive could not be reviewed on appeal,

as the question presented was one of fact, and not of law.

Other errors are assigned; but, deeming them unimportant, the judgment is affirmed.                                    AFFIRMED.