**UNITED STATES ex rel. CHAPMAN, Secretary of the Interior v. FEDERAL POWER COMMISSION et al.**

**VIRGINIA REA ASS'N et al. v. FEDERAL POWER COMMISSION et al.**

Nos. 6273, 6274.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 5, 1951.

Decided Oct. 1, 1951.

Gregory Hankin, Counsel, Department of the Interior, Washington, D. C. (Jesse L. Ballard, Southwestern Power Administration, Tulsa, Okl., Curtis H. Bell, Southeastern Power Administration, Elberton, Ga., and Milton C. Mapes, Jr., Portland, Or., Bonneville Power Administration, on the brief), for petitioner United States et al.

Robert Whitehead, Lovingston, Va. (Whitehead & Marshall, Lovingston, Va. on the brief), for petitioners Virginia REA Assn. et al.

Bradford Ross, Gen. Counsel, and Willard W. Gatchell, Asst. Gen. Counsel, Federal Power Commission, Washington, D. C. (Howard E. Wahrenbrock, Asst. General Counsel, and Sherman S. Poland, Washington, D. C., and Harry R. VanCleve, Jr., Los Angeles, Cal., on the brief), for Federal Power Commission, respondent.

T. Justin Moore, Richmond, Va. (Patrick A. Gibson, Washington, D. C., and Hunton, Williams, Anderson, Gay & Moore, Richmond, Va., on the brief), for Virginia Electric & Power Co., respondent.

Charles F. Rouse, Raleigh, N. C., and David W. Robinson, Washington, D. C., on the brief for Carolina Power & Light Co., Intervener.

Herbert B. Cohn, New York City, on the brief for Appalachian Electric Power Co., Intervener.

Before PARKER, Chief Judge and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

These are petitions by the Secretary of the Interior and a cooperative association engaged in supplying electricity to its members, asking that we review and set aside an order of the Federal Power Commission granting a license to the Virginia Electric and Power Company to construct a dam at Roanoke Rapids, North Carolina, some distance down the Roanoke River from the government project at Buggs Island. Petitioners contend that the Roanoke Rapids project was removed from the licensing power of the Commission by reason of the comprehensive plan for the development of the Roanoke River basin approved by Congress in the adoption of the Flood Control Act of Dec. 22, 1944, 58 Stat. 887; that the Commission is precluded from granting the license because of its approval of the comprehensive plan; and that, at all events, the Commission transcended its authority and abused its discretion in granting the license because the project as licensed was substantially different from the project as set forth in the plan approved by Congress, because it was not economically feasible and because it involved the surrender to a private corporation of val-

uable public power rights. All of these contentions were rejected by the Commission, and in addition the right of petitioners to raise the contentions was questioned on the ground that neither petitioner is a party aggrieved within the meaning of the statute, providing for review of the Commission's orders, 16 U.S.C.A. § 825*l*(b).

Four questions are presented for our consideration: (1) Is either of petitioners an aggrieved party within the meaning of the statute providing for review? (2) Has Congress withdrawn the proposed development at Roanoke Rapids from the licensing power of the Commission? (3) Is the Commission precluded from granting the license here questioned by reason of its approval of the comprehensive plan for the development of the Roanoke River basin? And (4) has the Commission transcended its authority or abused its discretion in granting the license? We think that all of these questions must be answered in the negative.

### 1. Standing of Petitioners to Sue

Review of the order of the Commission is asked under 16 U.S.C.A. § 825*l*(b), which allows review upon the petition of "any party * * * aggrieved by an order issued by the Commission". While petitioners were permitted by orders of the Commission to intervene in the proceedings before that body, this was upon condition that such permission not be construed as recognition that they might be aggrieved by any orders entered in the proceeding. The Solicitor General gave his permission that the Secretary of the Interior file a petition for review of the Commission's order; but it is clear that this could not confer any right to seek the review unless the Secretary is a party aggrieved within the meaning of the statute. The inquiry, then, is whether either the Secretary or the cooperative association can be held to be aggrieved by the order granting the power company the license to construct the dam at Roanoke Rapids.

The only grievance which the Secretary puts forward is that, if the power dam were built by the Government, he would have the right to sell the electric power produced; and the only grievance asserted by the cooperative association is that, if the Secretary should sell the power, it would have a preference in the right to purchase same. The language of the statute relating to the matter is as follows, 58 Stat. 890, 16 U.S.C.A. § 825s: "Sec. 5. Electric power and energy generated at reservoir projects under the control of the War Department and in the opinion of the Secretary of War not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Federal Power Commission. Rate schedules shall be drawn having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years. Preference in the sale of such power and energy shall be given to public bodies and cooperatives. * * *."

It is perfectly clear that this statute confers no right or interest in any power project or its development, or any responsibility with regard thereto, upon the Secretary of the Interior, or upon the cooperatives mentioned; but merely provides how the surplus power developed at government projects shall be disposed of. Whether a project shall be developed by the government or under license by private enterprise is a matter which Congress has committed, not to the Secretary or to cooperatives who may desire to purchase power from him, but to the discretion of the Commission. Section 7(b) of the Federal Power Act, 16 U.S.C.A. § 800(b), provides: "(b) Whenever, in the judgment of the Commission, the development of any water resources for public purposes should be undertaken by the United States itself, the Commission shall not approve any application for any project affecting such develop-

ment, but shall cause to be made such examinations, surveys, reports, plans, and estimates of the cost of the proposed development as it may find necessary, and shall submit its findings to Congress with such recommendations as it may find appropriate concerning such development."

That the United States, representing the people of the country, may have an interest ·in the construction of a power project does not confer upon the Secretary of the Interior any authority to go into court for its protection. The safeguarding of that interest has been confided to the Power Commission; and before a member of the cabinet may attack the Commission's action before the courts he must be able to point to some special·interest for which he is charged with responsibility that may be adversely affected by the action attacked. The only responsibility of the Secretary relates to the disposal of surplus power from government projects; and no duty or responsibility with regard thereto can possibly arise until the government has authorized the project and entered upon its construction.[1] Until then he has no more duty or responsibility in this connection than has the Postmaster General. A fortiori the cooperative association, whose only possible interest is to purchase power which the Secretary may sell, has no such right, duty or responsibility with respect to the construction of a power project as would give it standing in court to question an order of the Commission. No case has been cited which supports the right of either the Secretary or the association to ask review of the Commission's order, and we know of none. For cases holding generally that some right or interest of a complaining party must be invaded to justify him in asking relief in court, see Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Federal Communications Commission v. National Broadcasting Co., 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374; United States

Cane Sugar Refiners Ass'n v. McNutt, 2 Cir., 138 F.2d 116.

There is nothing in United States v. Interstate Commerce Commission, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451, which supports the position of petitioners. That case holds merely that suit by the United States to protect its interests is not precluded merely because the suit must be brought against a governmental agency. Nothing is said to indicate that an officer of the government may go into court against such agency to protect the public's interest with respect to a matter as to which he is charged with no duty or responsibility.

For the reasons stated, we are of opinion that petitioners are not parties aggrieved within the meaning of the statute and consequently have no standing in court to ask that the. order of the Commission be reviewed or set aside. Assuming, however, that they have such standing, we do not think that they have made a case entitling them to relief, since we are of opinion, for reasons which we shall now examine, that the granting of the license here in question was within the Commission's power and that there is no basis for holding that the discretion vested in it by law was not properly exercised.

### 2. The Power to Grant the License

No question is or can be raised as to the general power of the Commission to grant licenses, with proper conditions and limitations, to private corporations to construct power dams in the navigable streams of the country, as provided by the Federal Power Act and its amendments. 16 U.S.C.A. § 791a et seq. That act, which was passed for the purpose of developing and preserving to the people the water power resources of the country, expressly authorizes the licensing of water power projects to private enterprise for a limited period, upon terms which will safeguard the interests of the public, and with the right on

---

1. The Secretary of the Interior has, in fact, no responsibility whatever with respect to the disposal of power produced by any project until the Secretary of the Army has certified that in his opinion it is not needed in the operation of the project.

the part of the United States to take over the project upon terms that are just upon the expiration of the license. Recognizing that there are some projects which should be developed by the United States, and not by private enterprise, Congress has provided in section 7(b) of the act, heretofore quoted, that whenever in the judgment of the Commission the development of any project should be undertaken by the United States itself, the Commission shall not approve "any application for any project affecting such development", but shall submit to Congress its findings and recommendations with regard thereto.

■ The principal contention of the petitioners is that Congress took over the Roanoke Rapids project for construction by the United States in the Flood Control Act of 1944 and thereby removed it from the licensing power of the Commission. We agree with petitioners that where Congress takes over a project and authorizes its construction by the United States, the effect is to preclude the Commission's granting a license for its construction by a private corporation. Cf. Savannah River Electric Co. v. Federal Power Commission, 4 Cir., 164 F.2d 408. We do not think, however, that the Flood Control Act of 1944 can reasonably be construed as taking over for the United States the construction of the Roanoke Rapids project.

In 1944, the Chief of Engineers submitted reports to Congress recommending comprehensive plans for flood control in river basins throughout the United States. One of these reports, H.D. 650, related to the Roanoke River Basin and recommended, as economically justified, a comprehensive plan of improvement for that basin, consisting of 11 developments for hydroelectric power, flood control, navigation and other uses, the cost of each being separately estimated and the total estimated cost being $124,000,000. The report found that the comprehensive plan provided for the optimum development of the water resources of

the basin, and that, to safeguard the interests of navigation and flood control, the dams and power facilities should be constructed, operated and maintained under the direction of the Secretary of War and the supervision of the Chief of Engineers. The 11 developments listed in the order of their priority were Buggs Island, Gaston, Roanoke Rapids, Smith Mountain, Leesville, Taber, Melrose, Randolph (on the main stream or minor tributaries) and Philpott, Stuart and Schoolfield (on the larger tributary streams). Of these, only three, Buggs Island, Philpott and Smith Mountain, were flood control projects, the other eight being straight power projects.

We think it clear that, while giving its approval to the comprehensive plan for the development of the Roanoke River Basin, Congress did not adopt it in its entirety for governmental construction, but, on the contrary authorized construction of only the two principal flood control projects, Buggs Island and Philpott. The language of the statute having reference to the Roanoke River Basin is as follows, 58 Stat. 894: "Roanoke River Basin. *The general plan* for the comprehensive development of the Roanoke River Basin for flood control and other purposes recommended by the Chief of Engineers in House Document Numbered 650, Seventy-eighth Congress, second session, *is approved* and the *construction* of the Buggs Island Reservoir on the Roanoke River in Virginia and North Carolina, and the Philpott Reservoir on the Smith River in Virginia, are hereby *authorized* substantially in accordance with the recommendations of the Chief of Engineers in that report at an estimated cost of $36,140,000." (Italics supplied.)

■ Petitioners contend that the entire plan was adopted and authorized by reason of the general provision appearing in the opening paragraph of section 10 of the act, 58 Stat. 891,[2] which was followed by 15 pages listing plans for flood control and river basin development on practically ev-

---

2. The language relied on is as follows: "Sec. 10. That the following works of improvement for the benefit of navigation and the control of destructive flood waters and other purposes are hereby ■■■■■ adopted and authorized in the interest of the national security and with a view toward providing an adequate reservoir of useful and worthy public works for the post-war construction program, to be

ery important stream in the country as recommended in various reports of the Chief of Engineers. It could not reasonably have been intended, we think, that all of the projects embraced in these comprehensive plans were authorized for government construction without further action by Congress and were withdrawn from private development under license from the Commission; and the fact that the act expressly authorized certain of the projects is clear indication that others embraced within the plans were not authorized. Expressio unius est exclusio alterius. So far as projects in the Roanoke River Basin are concerned, their coverage by a specific paragraph withdraws them from the general provision under the well settled rule that general language of a statute will not be held to apply to a matter specifically dealt with. D. Ginsberg &. Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704; Clifford F. MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 894, 88 L.Ed. 1163. As said in the case last cited: "However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment. * * * Specific terms prevail over the general in the same or another statute which otherwise might be controlling.' "

When Congress intended to authorize the construction of an entire comprehensive plan of river development, it did so in no uncertain terms. In this very statute it authorized the construction of the entire plan proposed for the Upper Mississippi River Basin in language which contrasts strongly with the language here under consideration. The language there used was as follows, 58 Stat. at page 896: "In addition to previous authorization, there is hereby authorized to be appropriated the sum of $10,000,000 for the prosecution of the comprehensive plan approved in the Act of June 28, 1938, for the Upper Mississippi River Basin, including the project for the Red Rock Dam on the Des Moines River for flood control and

other purposes, substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 651, Seventy-eighth Congress, second session, at an estimated cost of $15,000,000."

Had Congress intended to withdraw all the projects of an approved general plan from the licensing power of the Commission, there was no reason why this should not have been done plainly and explicitly. In the 1928 Boulder Canyon Project Act, 45 Stat. 1057, 1062, it was provided that the Commission should not issue licenses affecting the Colorado River. 43 U.S.C.A. § 617e. A similar ban was placed on the granting of licenses to construct projects in the Potomac River Basin. 45 Stat. 1012. It is only reasonable to conclude that if Congress, having established a Federal Power Commission as a special administrative body to handle power projects, desired to strip the Commission of a great part of its control over the important rivers of the nation, it would have said so expressly and not by indirection.

█ It should be remembered, in this connection, that legislation relating to flood control or rivers and harbors, is no haphazard matter, but is handled by Congress through experienced committees with long continuity of service having in charge long range programs of development. They are in constant touch with the governmental agencies charged with carrying out the programs, and in interpreting legislation with regard thereto great weight must be accorded, not only to Congressional action which involves interpretation of prior legislation, but also to opinions expressed by members of the committees having the legislation in charge and members of the governmental agencies who carry out the programs. When these are looked to, there can be no doubt that the proper interpretation of the act is as we have indicated.

When the act was on passage, Mr. Whittington, Chairman of the House Committee on Flood Control, stated that all of the dams

prosecuted under the direction of the Secretary of War and supervision of the Chief of Engineers in accordance with

the plans in the respective reports hereinafter designated and subject to the conditions set forth therein: * * *."

authorized were primarily for flood control and none was primarily for the generation and distribution of power. 90 Cong.Record 4122, 4199, 4202. Senator Overton made the same statement in the Senate. 90 Cong. Record 8625. This would seem to negative any suggestion that it was intended to authorize straight power projects, like Roanoke Rapids, merely because they were embraced in the general plans that were given approval. As to the Roanoke River plan, the Senate Committee Report [3] states: "The Committee recommends approval of the comprehensive plan and *authorization for construction* of the *Buggs Island* and *Philpott* reservoirs in accordance with the recommendation of the Chief of Engineers." (Italics supplied).

Since the passage of the act, Congress has twice taken action which is inconsistent with the idea that projects not specifically authorized were adopted for construction because embraced in the general plans approved—once in considering but refusing to authorize the construction of the Smith Mountain project on the Roanoke River embraced in the comprehensive plan here under consideration, and again in authorizing the construction of the Hartwell project on the Savannah River. The projects on the Savannah River were dealt with in the Flood Control Act of 1944 in exactly the same way as those on the Roanoke, i. e. a general plan involving eleven projects was given general approval but only the Clark Hill project was authorized for construction. Later, when it was desired to proceed with one of the others, the Hartwell project, it was deemed necessary to obtain authorization for it, although it was one of the projects in the comprehensive plan which had been approved. When the omnibus bill H.R. 5472 was reported out by the House Committee, it contained the following sentence: "There is hereby authorized to be appropriated the sum of $40,000,000 for the construction of projects in the general plan for the comprehensive development of the Savannah River Basin * * *." A com-

mittee amendment was offered to this, restricting the authorization to the Hartwell project, which was explained by Chairman Whittington as "a clarifying amendment to make certain and definite that this authorization just refers to that project and no other." [4] If the general plans had been authorized for construction by the Flood Control Act of 1944, there would, of course, have been no reason for this legislation authorizing the Hartwell project, and no sense in rejecting the authorization of the Smith Mountain project. The Secretary attempts to explain the latter action on the ground that such authorization would have moved Smith Mountain ahead of Roanoke Rapids and Gaston in the plan of development, but no such reason appears to have entered into the consideration of Congress, which was told that Roanoke Rapids and Gaston were being developed by private enterprise and that Smith Mountain should be developed as a flood control project.

The Power Commission's interpretation that the Flood Control Act did not authorize the construction of the Roanoke Rapids project by the United States we have before us in this case; and the record leaves no doubt that the Board of Engineers places the same interpretation on the act. In testifying before the Committee of Congress with respect to the Hartwell project on the Savannah River, Lt. Col. Gee, representing the Board of Engineers, said:

"Col. Gee: The project is a part of the approved plan, sir.

"The Chairman: What do you mean by that to say, let us understand what you mean. Is not the word 'approved' an authorization for the plan but without appropriation, or without an authorization for the appropriation? What is the difference between approving and authorizing a plan?

"Col. Gee: We have never construed the approval of the plan to carry with it the authorization to construct the elements of that plan.

"The Chairman: Nor do we. * * *."

3. Senate Rept. 1030, 78th Cong., 2d Sess., June 22, 1944, on H.R. 4485.

4. 95 Cong.Rec. 11975.

And with respect to the Smith Mountain project in the Roanoke River plan, Col. Gee said:

"Mr. Pickett: I understand in the overall comprehensive plan that you have proposed 11 reservoir structures, only three of which have any part of their purpose to be flood control.

"Col. Gee: That is correct, sir.

"Mr. Pickett: And those three are Philpott, Buggs Island, and Smith Mountain.

"Col. Gee: Yes, sir.

"Mr. Pickett: Smith Mountain is the one presently under consideration, and you have under authorization and construction both Philpott and Buggs Island.

"Col. Gee. That is correct, sir.

\*　\*　\*　\*　\*　\*

"Col. Gee: We would be remiss in our duty as engineers serving the Congress if we did not point out to you the potentialities of the Roanoke River Basin. We have said in the report that the building of three of these 11 projects will produce all of that flood control which we believe to be economically justified, that the remaining 8 are straight power projects, and if it is desired that power projects be built by the federal government, we believe these are the sites best adapted to that purpose, and this is approximately what it will cost to develop the full capabilities of that river basin.

\*　\*　\*　\*　\*　\*

"Mr. Angell: Is the federal government at the present time planning to develop any of those dams on the lower part of the river which are devoted exclusively to power production?

"Col. Gee: No, sir. They have the same status in this basin plan as the eight remaining projects. They are part of the approved plan. Their being in that plan certainly is no bar to a private utility company coming in and seeking to develop one of these projects.

"Mr. Angell: And that is what is being done now.

"Col. Gee: That is being done now at Roanoke Rapids, sir."

Congress was thus thoroughly advised of the position that was being taken by responsible governmental agencies as to the meaning of the act. The fact that it has not taken action to withdraw projects within the plans approved from the licensing power of the Commission is an indication that it concurs in that position.

The question arises as to what is the effect of Congressional approval of a plan, if not to authorize and adopt it for construction by the United States. The answer, we think, is found in the Flood Control Act of 1936, 49 Stat. 1570, 1592, sec. 6, providing that when formal reports are made to Congress as therein authorized, no additional report or estimate shall be made unless authorized by law or by resolution of the Committee on Flood Control of the House or the Committee on Commerce of the Senate. A report submitting a plan of river development, if approved by Congress, lays down in general terms the policy of development to be followed. It does not authorize the projects embraced in the plan of development or commit Congress to constructing them.

The Secretary argues with respect to the Flood Control Act of 1936 that, because it contains a proviso that the government shall not be deemed to have entered upon any project for which it authorized preliminary surveys until the project shall have been "adopted" by law,[5] the general language of the 1944 act, heretofore quoted, which used the words "adopted and authorized" with respect to the plans, must be deemed to have "adopted" the plan of Roanoke River development, since the Roanoke River was one of the rivers for which a preliminary survey was provided by the 1936 act. It is a sufficient answer to this that the limitation inserted in the 1936

---

5. The language relied on is found at 49 Stat. 1592 and is as follows: "And provided further, That the Government shall not be deemed to have entered upon any project for the improvement of any waterway mentioned in this Act until the project for the proposed work shall have been adopted by law."

805

act was intended to preclude contentions that it had authorized projects for which it had authorized only preliminary surveys, not to enlarge the number of projects authorized by subsequent acts.

When we look to the history of flood control legislation, the reason and purpose of the act before us, and the effects and consequences of the interpretation placed upon it by the Secretary, we think that there can be no question but that our interpretation is correct. The Federal Water Power Act of 1920, 41 Stat. 1063, 16 U.S.C.A. § 791 et seq., was enacted after long discussion of how the water power of our rivers could best be developed and utilized with due consideration for the interests of navigation and flood control. The Senate Report (Senate Report 180, 66th Cong. 1st Sess.) recommending the passage of the act, says: "It is unnecessary to point out the need for or the beneficent results to come from water power development. It means a saving of coal, and a lower price for that used; a saving of oil, and a lower price for that consumed; more efficient transportation, and lower cost of service; the development of new industries; the building up of new communities; the creation of new property values, subject to taxation for the support and maintenance of local and state governments; and added employment for labor and increased markets for agricultural products. Every year that our water powers are undeveloped means a loss to the people in one form or another, almost, if not quite, equal to the cost of their development. Legislative action should be delayed no longer. We should do one of two things: We should pass legislation which will lead private capital and enterprise to develop these resources under such regulations as will give consumers good service and cheap power, or the government itself should proceed to make this development. This bill proceeds on the theory of private development with ultimate public ownership possible."

The President's Water Resources Policy Commission says of the Act (vol. 3, p. 272):

"Congress until 1920 generally gave direct legislative authorization on a project-by-project basis for nonfederal development of power on streams under its jurisdiction. Restrictive conditions in grants were few and inconsistent. And many of the grants were perpetual in their terms. With rare exception, they included no provision for imposition of a charge for the privilege itself, or for disposition of properties. But with the uncertainty of · a grantee's tenure and investment under grants subject to termination, private development had moved slowly.

"Seeking to remedy this situation, Congress in 1920 passed the Federal Water Power Act, regularizing and facilitating federal permission for nonfederal development through a licensing system. The Act's history reflects a legislative purpose to encourage nonfederal development while safeguarding the public interest and making possible ultimate public ownership. And as we shall see, the Act itself reserves a right to ultimate public ownership of licensed projects and also holds the door open to direct federal development by prohibiting the issuance of licenses whenever the Federal Power Commission determines that development should be undertaken by the United States."

■■■ There is nothing in subsequent legislation to indicate any intention to depart from the policy embodied in the Federal Water Power Act. The various flood control acts were directed to the construction of dams where flood control was the principal object and the production of hydroelectric power was incidental. For constructing these, overall plans of river basin development were necessary in the interest of navigation as well as of flood control; and it is not reasonable to assume that, in approving such plans and undertaking the flood control projects which they envisaged, Congress intended to withdraw from development by private enterprise the straight power projects lying in the river basins. It was foreseen, of course, that the building of the flood control projects would benefit power projects lower down the stream, but provision had been made, in section 10(f) of the Federal Power Act, for the Power Commission to assess the

value of such benefits against the licensees of the power projects. There would have been no sense in permitting water power to go to waste, when private enterprise was willing to develop it, merely because the government was constructing a flood control reservoir in the river basin and as incidental thereto had approved a general plan of river basin development.

### 3. The Commission's 1944 Approval of the Plan

On May 3, 1944, the Commission wrote a letter to the Chief of Engineers of the War Department giving its approval, with certain modifications, to the general plan for the development of the Roanoke River Basin recommended by the Engineers. The pertinent portion of that letter is as follows: "Based upon the consideration given hereinbefore, and upon careful review of the reports of your Department, the Commission concurs in the conclusion of the Board of Engineers for Rivers and Harbors that the comprehensive development of the Roanoke River Basin, in general accordance with the plans prepared therefor by the district engineer consisting of 11 dam and reservoir projects with power, is desirable and that the Buggs Island and Philpott projects would constitute a desirable initial step in the development of the Roanoke River Basin. The Commission believes that the power which could be produced at the Buggs Island and Philpott projects could be absorbed and profitably utilized in the postwar period within a reasonably short time following their construction and that plans, therefore, for these two projects should be prepared with the view to their construction in the early postwar period."

The Commission's approval of plans of this sort goes back to the Act of March 3, 1925, 43 Stat. 1186, 1190, which directed the Secretary of War and the Power Commission jointly to prepare and submit a list of streams on which comprehensive surveys should be undertaken and a list of the purposes for which improvements should be proposed. The Flood Control Acts of 1938, 52 Stat. 1215, and of 1941, 55 Stat. 638, provided that penstocks or other similar facilities adapted to possible future use should be installed in any dam therein authorized when approved by the Secretary of War upon the recommendation of the Chief of Engineers and the Power Commission. And the Commission states in its brief that it has worked very closely with the Army Engineers in connection with comprehensive river basin plans, known as 308 reports, since the preparation and submission of such reports was first required by Congress, and that, while there is no statutory requirement that the chief of Engineers submit to Congress the views of the Commission, he has consistently followed the custom of doing so.

Petitioners contend that the letter to the Chief of Engineers by the Power Commission amounted to a recommendation to Congress, pursuant to section 7(b) of the Federal Power Act, heretofore quoted, that all the projects in the plan submitted to Congress should be constructed by the United States. It is manifest, however, that this letter was merely an approval of the plan of the Engineers in accordance with the practice to which we have referred, and not a 7(b) recommendation to Congress. Even if it were construed to be the latter it would not preclude action by the Commission, since it was made in 1944 and Congress has taken no action in the meantime, except with respect to the Buggs Island and Philpott projects. In the case of application for a license for private development of power at a government dam, it is provided under section 4(e) of the Federal Power Act that a recommendation by the Commission in favor of government development prevents the issuance of a private license only for a period of two years after such recommendation. In the light of this statute, it would certainly be unreasonable to hold that where the government has no dam and has made no decision to build one, the Commission is prevented by such recommendation for a longer period from granting a private license. The natural resources of the country should not be withheld from needed development because of a recommendation of the Commission on which Congress has failed to act.

There is nothing to the contrary in our decision in Savannah River Electric Co. v. Federal Power Commission, 4 Cir., 164 F.2d 408, 411. That case involved the Clark Hill project, the construction of which had been expressly authorized by Congress and upon which work had already been commenced. We said that it could hardly have been intended by Congress that the Commission should have jurisdiction to grant licenses or to make reports to Congress "in the case of projects which Congress had expressly taken over for the United States and upon which work was going forward under appropriations made by Congress". We said further: "The commission had recommended * * * that the United States construct the project; and Congress had accepted its recommendation and had acted upon it. Public money had been spent upon the project and the work was going forward."

Petitioners make an additional contention to the effect that the private construction of the Roanoke Rapids project would adversely affect the comprehensive plan approved by the Commission and by Congress by damaging its feasibility and power benefits and that, since Congress has approved the plan, the Commission is without power to grant a private license. The contention is that the "cost to benefit" ratio of 1.47 of all 11 projects is reduced to 1.34 if the Roanoke Rapids project, with a ratio of 2.60, is removed from them. This argument, however, goes, not to the power of the Commission, but to the wisdom of its exercise of power; since it is for the Commission to say, where Congress has not already authorized the construction of a project, whether it should be licensed for private development or recommended to Congress for governmental construction. We point out hereafter that there was no abuse of discretion in this regard.

#### 4. The Commission's Exercise of Authority

Assuming that the Commission had power to license a power project within the general plan for the Ronaoke River development, petitioners contend that the Commission transcended its authority or abused its discretion here: (a) because the project licensed did not confrom to the general plan as approved in the Flood Control Act of 1944; (b) because the Roanoke Rapids project was not economically feasible for private development; and (c) because the granting of the license involved the surrender to private interests of valuable public power rights. We think that there is no merit whatever in any of these contentions.

(a) With respect to the difference between the project as licensed and as outlined in H.D. 650 approved in the Flood Control Act, it appears that the dam as licensed is located a little farther down stream and has an elevation of 132 instead of 127 feet and that the project has an 8,000 foot tailrace instead of an 8 mile canal. This canal would make an island out of the towns of Roanoke Rapids and Weldon, would be very costly in view of urban development since 1944 and would be a deterrent to further community development. These changes received the approval of the Commission and the Army engineers, they increased the capacity of the project from 58,800 to 91,000 k.w. and the evidence shows that from every standpoint they were wise and salutary. They were insisted upon by the staff of the Commission and increased the cost of the project to the licensee by several millions of dollars. They are not of significance with respect to the federal purposes of the river basin development, they do not interfere with the complete fulfillment of the objectives of the plan and they are necessary to a more complete utilization of the water resources that are being developed. They are in accordance with the overall purpose of the plan and not a departure from it and furnish no basis for holding that the Commission has transcended its authority or abused its discretion in the premises. The general approval given the original plan did not make its details a matter of statute or freeze the development of the project so as to preclude minor changes which would add to its feasibility and efficiency.

(b) The Commission found that the construction of the Roanoke Rapids project by the Power Company, which would

use it for peaking purposes in connection with steam generating equipment, was economically feasible and was the construction best adapted to the proper development of the project for power purposes; and we think that this finding is amply supported by the testimony. There was testimony of expert engineers that with the natural flow of the stream the project would be economically feasible as a peaking plant for the Power Company, that the operation of the Buggs Island project would greatly increase its production of electric energy and that after payment of headwater benefit charges of $261,000 per year, which might reasonably be assessed in favor of the Buggs Island project, the cost of producing current would be less than the cost of generating it by the use of steam. Petitioners attack this testimony with arguments based on isolated portions of the testimony of some of the experts; but it was for the Commission, not the courts, to say what parts of the testimony of the witnesses it would accept and what conclusions it would draw from them. And the rule is well settled that we must affirm its findings if supported by substantial evidence.

The rule is no different because the questions involve matters of scientific knowledge and the evidence consists largely of the opinion of experts. The court may not, for that reason, ignore the conclusions of the experts and the Commission and put itself in the absurd position of substituting its judgment for theirs on controverted matters of hydraulic engineering. It is in just such matters that the findings of the Commission, because of its experience and the assistance of its technical staff, should be accorded the greatest weight and the courts should be most hesitant to substitute their judgment for that of the Commission. We deal with a similar question in Travelers' Indemnity Co. v. Parkersburg Iron & Steel Co., 4 Cir., 70 F.2d 63, 64, where the contention was made that questions of fact dependent upon scientific knowledge should be decided by the court and a verdict directed accordingly. What we said there with reference to such questions being for the decision of the jury applies with even greater force here, where the question is one of substituting our judgment for that of the Commission, a body constituted by law and qualified by experience for dealing with the technical scientific matters involved. We said in that case: "The rule is well settled, of course, that evidence contrary to established physical facts has no probative value. U[nited] S[tates] v. Diehl, 4 Cir., 62 F.2d 343; Atlantic Coast Line R. Co. v. McLeod, 4 Cir., 11 F.2d 22. But to justify the ignoring of evidence under this rule the evidence ignored must be utterly at variance with well-established and universally recognized physical laws and therefore inherently impossible. See Wasiota & B. M. R. Co. v. Hall, 167 Ky. 819, 181 S.W. 629; Wolf v. City R. Co., 50 Or. 64, 85 P. 620, 91 P. 460, 15 Ann.Cas. 1181. The rule means merely that courts are not required to stultify themselves by giving serious consideration to what every man knows to be untrue. It does not mean that they must determine for themselves, from the testimony of experts or otherwise, the truths of science which may be involved in cases before them, and ignore testimony that does not coincide with their conclusions. Questions of fact are questions for the jury; and they do not become questions for the court merely because their solution may require scientific knowledge or expert opinion."

██ (c). It is argued that the granting of the license to a private company involves the surrender of valuable power rights belonging to the public, because it is said that the government could obtain the capital necessary for development at a low interest rate and could supply current at a low cost to the users of electricity. The question as to whether a power project should be licensed for construction by private enterprise or constructed by the government itself is one which, as we have seen, Congress in section 7(b) of the Federal Power Act has entrusted to the judgment of the Commission; and the Commission has given consideration to the question and has decided it adversely to the contention of the petitioners. Its findings with respect to the matter are as follows:

"(57) The record in this proceeding does not provide a proper or sufficient basis for

judgment or a finding under section 7(b) of the act that development of the water resources at Roanoke Rapids should be undertaken by the United States itself or for the submission of such findings and a recommendation to Congress to such effect, as provided in such section.

"(58) The evidence received does not show that the Roanoke Rapids site would be developed at any time by the Federal government, should the pending application for license be denied. Such denial would of course permit the water, which the applicant plans at once to utilize, to continue to be wasted to the sea."

The Chief Examiner of the Commission, in his report, which was approved by the Commission, said: "All arguments for recommendation for federal development would seem to be premised upon an assumption for which no basis can be found in the record—that the United States will in fact build Roanoke Rapids within some reasonable, foreseeable time, if no federal license is issued to a private or non-federal applicant. The contrary appears to be the fact. The probability is that so far as the United States is concerned, the water resources at Roanoke Rapids are destined to be undeveloped and unutilized for a long time to come. It is not believed that such wastage or nonutilization of water resources can be in the public interest, particularly when there is a need for the energy in the area and a private developer with private capital stands ready, willing, and able to utilize them, with the protection of the public interest furnished by the terms and conditions of a federal license."

Little need be added to what was said by the Commission and the Chief Examiner. The fact that the cost to benefit ratio for Roanoke Rapids is higher than that of the other projects in the general plan does not mean that private enterprise is being allowed to profit at the expense of the public. Roanoke Rapids is a straight power project and its high ratio is based upon its estimated power production, increased as it will be, by the headwater benefits from Buggs Island. If Roanoke Rapids is li-censed for private development, however, these headwater benefits will be taxed in favor of the government as owner of Buggs Island and against the Roanoke Rapids project, so that the public will be compensated for any benefit that results to Roanoke Rapids from the Buggs Island construction. Surely it is in the public interest that this be done rather than that the potentialities of Roanoke Rapids remain undeveloped and the government lose the compensation for the headwater benefits which would accrue from its development.

The proposed development will involve the investment of some $27,000,000 by the Power Company. It will have a total installed capacity of 91,000 kilowatts. The annual value of its capacity and energy will be around $400,000 over and above annual costs. All of this is being lost so long as the project is not constructed; and its construction, even though by private enterprise, adds just that much to the wealth of the country and the available electrical energy, so greatly needed in this period of national emergency. To permit its construction as provided by the license, will surrender no public assets to anyone but will merely permit the Power Company to develop the property which it has already acquired for power purposes and thus utilize a source of power now being wasted. The property will be operated in the public interest and the charges for power will be fixed by the Commission, as provided in the power act. The United States will be paid for headwater benefits from Buggs Island around a quarter of a million dollars a year and will have the right to acquire the project at the end of the term of the license in accordance with the terms of that act. In this situation, it cannot reasonably be said that the Commission has abused its discretion and is surrendering valuable rights of the public because it does not refuse a license for construction by private enterprise of this project which Congress has shown no intention of constructing.

For the reasons stated, the petitions asking that the order of the Commission be set aside will be denied.

Petitions denied.